UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
At Cookeville

WAYNE E. SADLER,                    )
                                     )
         Plaintiff,                  )      Case No. 2:05-CV-00105
                                     )      JURY DEMAND
v.                                   )      Magistrate Judge Brown
                                     )
TENNESSEE BOARD OF REGENTS           )
d/b/a Tennessee Tech University,     )
                                     )
         Defendant.                  )


MEMORANDUM

    Plaintiff, Wayne E. Sadler, filed this action against Defendant, Tennessee Board of

Regents d/b/a Tennessee Tech University, asserting three, separate violations of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.:[1]   (1) race discrimination

through disparate treatment regarding promotion, compensation, disciplinary policies, practices

and procedures, (2) hostile work environment, and (3) retaliation.  The gravamen of Plaintiff's

complaint is that from the outset of his employment, which began in 1988, he was, on an

irregular basis, subjected to racial slurs and racially discriminatory practices.  Plaintiff alleges

that in the fall of 2004, these incidents and practices became serious enough for him to file an

EEOC complaint.  Plaintiff further contends that after filing the EEOC complaint, the work

environment became more hostile and Defendant took actions which constitute retaliation.

    Before the Court is Defendant's motion for summary judgment (Docket Entry 21),

---

[1]It is a bit unclear in the Complaint as to what specific violations of Title VII the Plaintiff
is asserting.  Therefore, in an abundance of caution, the Court will address all possible actions
raised by the Complaint.

1

contending in sum that Plaintiff cannot establish a *prima facie* case for any of the asserted claims and, in the alternative, that it has provided legitimate, non-discriminatory reasons for any of the alleged adverse employment actions and that Plaintiff has provided no evidence that these proffered reasons were a pretext for discrimination.  Plaintiff responds that he has established that several adverse employment actions took place.  (Docket Entry 27).  For the reasons which follow, Defendant's motion for summary judgement will be granted, and this action will be dismissed.

## A.  FACTUAL BACKGROUND

Plaintiff is an African-American male who began his employment with Defendant in August 1988.  (Docket Entry 28 ¶ 1; Docket Entry 1, ¶ 6).  Plaintiff was interviewed and hired by Susan Pogue, Director of Human Resource Services, (hereinafter "Pogue") and Pogue's supervisor, Terry Rector, Vice President of Fiscal Affairs (hereinafter "Rector").  (Docket Entry 28 ¶ 1).  Pogue was Plaintiff's sole immediate supervisor for approximately 18 years, from August 1988 until August 1, 2006, when Pogue changed positions.[2]  (Docket Entry 28 ¶ 2).

From February 1989 through May 2005, Plaintiff received evaluations from Pogue. (Docket Entry 28 ¶ 18).  Pogue rated the Plaintiff as follows:

|              |     |
|--------------|-----|
| February 1989 | B+  |
| April 1989    | B+  |
| April 1990    | A-  |
| April 1991    | A   |
| April 1992    | A   |
| April 1993    | A   |
| April 1994 thru |   |

---

[2]Pogue changed positions from Director of Human Resource Services to teaching human resource management, compensation, and effective supervisory skills to "reduce her stress level."  (Docket Entry 24, Exhibit, Bates Number 000118).

April 2002          A+
May 2003            A
May 2004            No evaluation.
May 2005            B-

In general, Pogue's evaluations of Plaintiff were extremely positive.  However, from the very

first evaluation in 1989, Plaintiff was consistently encouraged to be more productive with his

time. (Docket Entry 28 ¶ 19).[3]  Throughout the evaluations and from "day one, '88,"[4] Pogue

_____

[3]

There are consistent remarks throughout Plaintiff's evaluations about the reducing the amount of time to complete classification studies as well as the need to improve general time management.  The following are a few examples:

In Plaintiff's 1989 evaluation, Pogue writes: "Timetables for completion of studies have not been met.  There is a need to assess the amount of time allocated to any one review and be cognizant. . .[when] further time spent on a study does not produce a corresponding amount of results."  (Docket Entry 24, Exhibit, Bates Number 000075).

In Plaintiff's 1991 evaluation, Pogue writes: "Wayne continues to be an excellent ambassador for the office.  He tackles any assignment with good-will and diplomacy.  Allowing other to usurp his time hinders accomplishing as much as he would like to in his area of responsibilities."  (Docket Entry 24, Exhibit, Bates Number 000078).

In Plaintiff's 1993 evaluation, Pogue writes: "His contributions to the University extend beyond the boundaries of his job description.  He is a delight to work with.  Suggestions for development 1) Proof-read documents more closely 2) Continue on assertiveness in not allowing people to usurp his time.  (Docket Entry 24, Exhibit, Bates Numbers 000080-000081).

In Plaintiff's 1994 evaluation, Pogue writes: "Wayne continues to be an excellent ambassador for the office. . .working with Wayne is a pleasure.  Suggestions for development 1) Proof-read documents more closely 2) Make a daily 'to-do' list 3) Exercise more assertiveness in not allowing people to usurp his time, particularly when it is not a work-related topic."  (Docket Entry 24, Exhibit, Bates Number 000083).

In Plaintiff's 1995 evaluation, Pogue writes: "Wayne continues to do a quality job.  As part of the office management project he has diligently worked for ways to better control the use of his time.  Accomplishment of some goals such as moving the routine ADA analysis and affirmative action have not occurred in a timely fashion due to circumstances beyond his control.  The nature of Wayne's job necessitates blocks of uninterrupted time in an environment where he can think.  We will continue to work together to try to produce those opportunities.  This should help meet the goal of reducing the time it takes to complete a class/comp study."  (Docket Entry 24, Exhibit, Bates Number 000085).

In Plaintiff's 2003 evaluation, Pogue writes that a job specific major goal for Plaintiff was to "conclude classification studies in a more timely fashion by reducing time from start to finish."  (Docket Entry 24, Exhibit Bates Number 000108).

[4]In his deposition, Plaintiff states that, "There was, all pretty much throughout the years I've been there, a consistent push to reduce the amount of time that it took to do reclassification studies....[but that] it was impossible [for me to speed up the process] as other duties and responsibilities began to pop up and became more and more primary functions..."  Plaintiff further states that it was unreasonable to ask that the time be reduced for these classification studies when looking at the "total scope" of his job responsibilities.  (Docket Entry 24, Exhibit, Bates Number 000036).

4

requests that Plaintiff reduce the amount of time it took him to do classification studies. (Docket Entry 28 ¶ 20).[5] Plaintiff was unable, for various reasons, some of which were beyond his control,[6] to reduce the time that it took him to complete classification studies. (Docket Entry 28 ¶ 21); (Docket Entry 24, Exhibit, Bates Number 000036-000038). Additionally, it appears that from the beginning of Plaintiff's employment, Pogue required Plaintiff to keep time records, tracking how Plaintiff was spending his work days and/or time spent on each classification study. (Docket Entry 24, Exhibit, Bates Number 000038-000039).[7]

In addition to time modification requests, Plaintiff was also advised, in his first evaluation in 1989, that any salary/classification modifications should not be discussed with the affected employee until a final approval through the chain of command was received.[8]

On August 11, 1999, Plaintiff requested that his title be changed from "Personnel Management Analyst" to "Manager (Classification/Compensation)." (Docket Entry 28 ¶ 10). This request, upon recommendation of Pogue, was approved. (Docket Entry 28 ¶ 10). On February 9, 2000, Pogue nominated Plaintiff for Defendant's Outstanding Professional Award.

---

[5]In his deposition, Plaintiff was asked, "Did Ms. Pogue complain about the timeliness of your work?" Plaintiff responded: "There was, all pretty much throughout the years I've been there, a consistent push to reduce the amount of time that it took to do classification studies. . . from day one, [19]88. . ." (Docket Entry 24, Exhibit, Bates Number 000036)

[6]See Footnote 5, Plaintiff's 1995 Evaluation. (Docket Entry 24, Exhibit, Bates Number 000085)

[7]Specifically, Plaintiff contends that he was required to keep a log of when the request for classification came in and then all other "major steps along the line" to completing the study. (Docket Entry 24, Exhibit, Bates Number 166).

[8]In his first evaluation in February 1989, Pogue writes: "Care needs to be given to comments made to players. Communication through the chain of command should be followed at all times. No recommendations should be discussed with the employee until a final approval has been received." (Docket Entry 24, Exhibit, Bates Number 000075).

5

(Docket Entry 28 ¶ 11).[9]  Plaintiff later declined the nomination.  On March 23, 2002, Plaintiff

requested an annual salary increase in the amount of $8,000.00. (Docket Entry 28 ¶ 12).  Upon

receiving this request, Pogue and Rector recommended that Plaintiff receive an annual salary

increase in the amount of $8,980.  (Docket Entry 28 ¶ 13).[10]  On April 10, 2002, this

recommendation was approved and Plaintiff received the requested $8,000 salary increase, plus

an additional $980.00.  (Docket Entry 28 ¶ 14).

     In May 2003, Plaintiff entered Pogue's office and thanked Pogue for being a good boss

---

[9]As part of her nomination, Pogue wrote: "Wayne's job is extremely difficult, but he always takes time to explain processes, results, etc in a very friendly and helpful way.  He never complains and willingly helps with office responsibilities that are outside his primary area. Wayne is actively involved in serving on University committees and has spent many hours providing services and input to the Commission on the Status of Blacks.  He has also volunteered many hours on activities sponsored by the Minority Affairs Office. . .Wayne is an individual in whom I have the utmost confidence.  He has absolute integrity and continually supports University efforts to improve.  He is a consummate professional."  (Docket Entry 24, Exhibit, Bates Number 000111-000112).

[10]The relevant portions of Pogue's recommendation for salary increase are as follows:

Mr. Wayne Sadler, Manager Wage and Salary, is giving very serious consideration to leaving TTU and establishing his own business as a compensation consultant.  Financial considerations are his primary concern.

Mr. Sadler occupies a key position, and finding a replacement who has the depth and breadth of his experience would be extremely difficult, if not impossible.  TTU has saved hundreds of thousands of dollars in implementing its C & S and Administrative Pay Plans without having to hire an outside consultant as the other TBR universities have had to do.  Wayne has worked at the TBR office as well as TTU and is more familiar with the current system-wide clerical and support plan than anyone else in the TBR system.

Wayne has also been an outstanding mentor and friend to other African-Americans as they have joined the TTU family.  As an African-American, he has worked diligently to help us recruit and retain African-American faculty and staff.

(Docket Entry 28, Exhibit, Bates Number 000071 and 000072).

and her husband for being a good friend. (Docket Entry 28 ¶ 15). On June 12, 2003, Plaintiff

requested that President Robert Bell, via Rector, grant a leave of absence commencing on July 1,

2003, and ending on August 11, 2003. This request was granted. (Docket Entry 28 ¶ 16).[11]

Prior to returning to work, Plaintiff requested an additional seven days of leave to attend his

son's graduation. This request was also granted by Defendant. (Docket Entry 28 ¶ 17).

In the fall of 2004, Plaintiff alleges that Pogue informally reduced his authority and

responsibility for the review and analysis of reorganization proposals and similar proposals for

---

[11]Plaintiff's request for a leave of absence, in complete form, states:

This is to request a leave of absence commencing on July 1, 2003 and ending August 11, 2003. Various stresses in my life of recent coupled with a growing inability to maintain good mental health in a work environment I experience as overly oppressive and demeaning have brought upon anxiety and the feelings of desperation and hopelessness as a prisoner. I seem unable at present to continue to function, as I should under the manner and tenor of supervision received. I am made to account for all my time–time spent in researching and responding to queries, requests for data, analysis and review of all job related matters stemming from any and all contacts with the Tn Board of Regents, sister institutions, departmental staff, etc. I find it very difficult and stressful to record and account for so much in so much detail. My mail is opened and examined before I receive it, even the rare personal correspondence or thank-you notes of colleagues. Every conversation and communication with co-workers is treated as suspect. I have come to the point of being mentally split with anxiety of asking or reporting a sick day for something even as severe as pleurisy because I am made to feel I am not believed. I blame my condition more so on myself than any outside causes. I should be stronger and better able to cope.

I would very much appreciate being allowed the time to try to strengthen and regain mental stability and peace of mind necessary to function well in the unique HR environment at Tenn Tech University. I very much enjoy my job and working for the great staff of this Univeristy and wish to have the opportunity to regain the strength to continue service. This is difficult and somewhat embarrassing to admit that I am not as strong as I try to present, but this too possibly illustrates the importance of this request to me. Thank you for consideration of this request.

(Docket Entry 24, Exhibit, Bates Number 000116).

7

the creation of new positions.[12] (Docket Entry 24, Exhibit, Bates Number 000023). This is one of Plaintiff's many job responsibilities. (Docket Entry 24, Exhibit, Bates Number 000064-000066). Plaintiff states that while Pogue still asked for his thoughts on proposed reclassifications, he was no longer given the same amount of authority. (Docket Entry 24, Exhibit, Bates Number 000024-000025). However, Plaintiff's formal job description did not change nor did his salary or title. (Docket Entry 24, Exhibit, Bates Number 000024-000025).

On October 6, 2004, Plaintiff submitted to Pogue an unsolicited job reclassification recommendation for his own position. The reclassification recommended an increase in Plaintiff's title as well as an increase of two pay grades higher. (Docket Entry 28 ¶ 25)(Docket Entry 24, Exhibit, Bates Numbers 000127-000129). It appears that Pogue disagreed with Plaintiff's description of his job duties and responsibilities as well as Plaintiff reclassifying his own position.[13] (Docket Entry 24, Exhibit, Bates Numbers 000130-0135). Pogue believed that Plaintiff's duties "were overstated, not assigned to the position, or done by other people in the office as part of their job responsibilities." (Docket Entry 25 ¶ 18). On approximately that same date or shortly before, Plaintiff prepared the paperwork that would accompany his EEOC complaint. (Docket Entry 28 ¶ 26).

---

[12]Defendant disputes this allegation, as fully discussed later in this Opinion. Pogue states, "In 2004 or 2005, I performed one classification study without the assistance of Mr. Sadler at the request of Mr. Rector due to the negative attitude Mr. Sadler had previously displayed about the Vice President requesting the review and the frequent changes in his area. This was the only classification study that I can recall in which Mr. Sadler did not review and/or comment on a classification request." (Docket Entry 25 ¶ 23).

[13]Pogue stated that had she or Rector wanted a review of Plaintiff's position, they would have "consulted the Human Resource Office at the Board of Regents for assistance to avoid the appearance of being self-serving." (Docket Entry 25 ¶ 17).

8

On October 8, 2004, Pogue sent a memorandum to Plaintiff requesting that Plaintiff, who was teaching an extended education course, follow the Defendant's policy concerning outside employment, i.e. that he receive approval before engaging in outside employment.[14]  (Docket Entry 24, Exhibit, Bates Number 000136).  The memorandum, which Pogue contends was not a written warning and was not placed in Plaintiff's personnel file, concluded, "I'm delighted you've had the opportunity to do this as I know how much you enjoy photography.  If the opportunity arises again or if other outside employment or extra assignments become available, please follow University policy as outlined in Outside Employment and Extra Compensation."  (Docket Entry 24, Exhibit, Bates Number 000136); (Docket Entry 25 ¶ 19).

On October 19, 2004, Plaintiff filed his complaint with the EEOC.[15]  (Docket Entry 28 ¶ 27).

In May 2005, Plaintiff received an evaluation grade of B-.  (Docket Entry 24, Exhibit, Bates Numbers 000121-000126).  This is the lowest "grade" Plaintiff had received throughout his employment with Defendant.  In the evaluation, Pogue cited the following as reasons, among others, for the lower evaluation grade stating that Plaintiff: has allowed personal feelings to blur his professional judgment, has not responded positively to goal of reducing the amount of time it takes to conduct classification studies, has increased the number and significance of errors, has spent too much time on things other than completing class/comp studies, has not been receptive

---

[14]The Defendant's policy states that "prior to engaging in outside employment or accepting an extra assignment, the faculty or staff member shall notify appropriate supervisors of the nature of the employment and the expected commitment of time."  (Docket Entry 24, Exhibit, Bates Number 000136).

[15]The Court has not been provided with a copy of the EEOC complaint.

to guidance or suggestions, has not realigned focus to concentrate on classification studies, has caused a decline in communication with supervisors whom he treats with anger, sarcasm and a lack of professionalism.[16]  Pogue concluded her evaluation stating that, "Wayne is capable of returning to A+ work and altering his behavior.  I would like to see him do that."  (Docket Entry 24, Exhibit, Bates Number 000126).

On June 29, 2005, Plaintiff, Rector and Pogue had a meeting to discuss the dissemination of information regarding classification studies prior to these studies having final approval. (Docket Entry 25 ¶ 21).  Specifically, Pogue and Rector expressed concerns that Plaintiff was providing incorrect information to secretaries regarding a moratorium on secretary classifications which was causing agitation.  (Docket Entry 25 ¶ 21).

Approximately one week later, on August 1, 2005, Plaintiff was issued a written warning for insubordination and unprofessional conduct.  (Docket Entry 28 ¶ 28)(Docket Entry 24, Exhibit, Bates Numbers 000137-000138).  The substance of the warning insinuates that the Plaintiff purposefully misinformed an employee on July 8, 2005, about a request for a classification study after Pogue, on June 29, 2005, specifically directed him not to discuss this issue until the Defendant's Vice Presidents came to a decision.[17] (Docket Entry 24, Exhibit,

_____

[16]As an example, Pogue stated that, "On a number of occasions when I have brought materials to Wayne, his only response has been a grunt."  (Docket Entry 24, Exhibit, Bates Number 000125).

[17]Pogue states, "On August 1, 2005, I issued a written warning to Mr. Sadler concerning his insubordination and unprofessional conduct.  Prior to June 29, 2005, Mr. Sadler had been spreading incorrect information to employees of the university which could malign our department and potentially impair its function.  For instance, Mr. Sadler informed individuals that might be affected by a study as to his thoughts before the study had been reviewed by me and finalized.  As stated in the written warning letter, on June 29, 2005, Mr. Rector and I met with Mr. Sadler and expressed concern that he was providing incorrect information to secretaries

10

Bates Numbers 000137-000138) (Docket Entry 25 ¶ 20).

On October 3, 2005, Plaintiff filed the instant action.

## B. LEGAL DISCUSSION

### 1. Standard of Review

The Magistrate Judge has applied the well-established standard for determining summary judgment motions. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails "to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. The Higbee Company*, 256 F.3d 416, 419 (6th Cir. 2001).

In this connection, it must be noted that the nonmovant must present sufficient admissible evidence on a material issue to qualify his case to go to the trier of fact. *Anderson v. Liberty*

---

and causing agitation. Nevertheless, a little over a week after our meeting, Mr. Sadler stated in a memorandum to a secretary that there was a moratorium on any review of secretarial positions. Mr. Sadler knew this to be incorrect and sent the memorandum to cast me and the office in a negative light. Furthermore, there was no need that a memorandum of any kind have been sent. Thus, Mr. Sadler was issued a written warning." (Docket Entry 25 ¶ 20 and 21).

*Lobby, Inc.*, 477 at 255. Thus, while the nonmoving party may produce some evidence, the production will not be sufficient to defeat summary judgment so long as no reasonable jury could reach a finding on that issue in favor of the nonmoving party. *Id*. at 248.

### 2. Title VII Claims

Title VII prohibits discrimination in employment on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1). In a Title VII case, a plaintiff bears the ultimate burden at all times of persuading the fact finder that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)(citing *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981)). A plaintiff may carry this burden by introducing direct evidence which shows that in treating a plaintiff adversely the defendant was motivated by discriminatory intent *or* by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

Direct evidence of discrimination is that evidence which does not require a fact finder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of a protected group. *Johnson v. The Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Under the direct evidence approach, once the plaintiff introduces evidence that the employer took the challenged employment actions because of plaintiff's race or other protected status, the burden shifts to the employer to prove that it would have taken the challenged employment actions even if it had not been motivated by discrimination. *Johnson v.*

12

*University of Cincinnati*, 215 F.3d 561 (6th Cir. 2000).

Under the circumstantial evidence approach, there is a the three-step burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff must first set forth a *prima facie* case of discrimination. *Id*. The establishment of a *prima facie* case creates a rebuttable presumption of discrimination which then requires the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. Defendant bears only a burden of production, not persuasion, i.e. the defendant does not bear the burden of persuading the Court that it was actually motivated by the proffered reason, only that defendant's evidence raised a genuine issue of fact as to whether it discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. at 142; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981). If the employer carries this burden of production, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons given by the employer were actually a pretext to hide racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. More specifically, a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions. *Kocsis v. Multi-Care-Management, Inc.,* 97 F.3d 876, 883 (6th Cir. 1996). Although the burdens shift back and forth under this framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253.

Plaintiff alleges three violations of Title VII: (1) race discrimination through disparate treatment regarding promotion, compensation, disciplinary policies, practices and procedures. Plaintiff (2) a hostile work environment and (3) retaliation. The Court considers each in turn.

13

### a. Race Discrimination

To establish a *prima facie* case of race discrimination under Title VII, a plaintiff must that plaintiff (1) is a member of a protected group, (2) was subject to an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protect class or treated differently from similarly situated members of an unprotected class. *McDonnell Douglas*, 411 U.S. at 802. In the instant case, both parties concede that Plaintiff is a member of a protected group and is qualified for his position. However, Defendant argues that Plaintiff has failed to establish that he was subjected to any adverse employment actions and/or that he was treated differently from similarly situated members of an unprotected class. (Docket Entry 22, Page 4).

An adverse employment action is a materially adverse change in terms or conditions of employment because of an employer's conduct. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)(citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d at 885. A materially adverse change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Id.* A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-462 (6th Cir. 2000). "The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse, and thus, not actionable." *Id.* at 462. The adverse employment action element was designed to filter out discrimination cases that caused "merely inconvenience" or a "bruised ego." *Mitchell v. Vanderbilt Univ.*, 389 F.3d at 183 (citing *White v. Burlington N. &*

14

*Santa Fe Ry.* Co., 364 F.3d 789, 802 (6th Cir. 2004)(quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d at 886).

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of a non-minority employee, the plaintiff must show that the "comparables" are similarly - situated in all respects. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). To be deemed similarly situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguishes their conduct or the employer's treatment of them for it. *Id.*

Plaintiff has presented no direct evidence of discrimination. Therefore, the Court must look to any circumstantial evidence which allows for inference of discrimination following the burden shifting approach. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. Plaintiff alleges in the Complaint that the following were adverse employment actions: (1) the October 8, 2004, memorandum regarding outside employment (Docket Entry 24, Exhibit, Bates Number 000136) and (2) the removal of job responsibilities from his position which, in turn, limited promotion availability. Additionally, in his Memorandum in Opposition to the instant motion, Plaintiff alleges that the following were also adverse employment actions: (3) limited access to career conferences where he could network for future employment positions; (4) inappropriate job classification and salary; and (5) the time constraints and record keeping required. (Docket Entry 27, Pages 3-6).[18]

---

[18]Defendant has discussed in it's Motion for Summary Judgment other possible adverse employment actions beyond this list. However, as the Plaintiff himself does not assert that these are adverse employment actions, the Court need not address them.

15

Plaintiff is required to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Testimony consisting of nothing more than rumors, conclusory allegations and subjective beliefs is wholly insufficient evidence to establish a claim of discrimination as a matter of law. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The Plaintiff's unsubstantiated opinion, alone, will be insufficient to defeat the motion for summary judgment without "any significant probative evidence tending to support the complaint." *Anderson v. Liberty Lobby*, 477 U.S. at 249. With all five of the alleged adverse employment actions, Plaintiff has failed to set forth any evidence beyond the allegations of his pleadings and/or his deposition that these were adverse employment actions and/or that he was treated differently from similarly situated members of an unprotected class. In fact, Plaintiff does not produce any evidence as exhibits to support his Complaint. Further, in his Opposition to this instant motion, Plaintiff fails to cite any evidence beyond his own deposition.[19]

While the Court recognizes the importance of preserving discrimination litigants' rights to a trial on their claims, which can often be difficult to substantiate, the Court is not prepared to extend those rights to the point of allowing anyone who files a race discrimination complaint to proceed to trial in the absence of any significant probative evidence tending to the support the complaint. *Id.* Because Plaintiff failed to produce sufficient affirmative evidence to establish that he was subjected to any adverse employment actions and/or that he was treated differently from similarly situated members of an unprotected class, Plaintiff's claim for race discrimination must fail.

---

[19] Further, the Court notes that the Plaintiff cites to portions of the Plaintiff's deposition that have not even been submitted to the Court.

16

Even if Plaintiff had produced evidence establishing a *prima facie* case of race discrimination, the Court notes that Plaintiff's race discrimination claim still could not succeed. Defendant presented evidence under the second stage of the *McDonnell Douglas* framework articulating legitimate, nondiscriminatory reasons for all actions taken. According to Defendant: (1) the October 8, 2004, memorandum regarding outside employment was not a formal reprimand, nor was the memorandum placed in his personnel folder, but rather, it was a request that Plaintiff comply with the stated policy in the future (Docket Entry 25 ¶)(Docket Entry 24, Exhibit, Bates Number 000136); [20] (2) Plaintiff's job responsibilities were not reduced because Pogue performed only one classification study without the assistance of the Plaintiff as the person requesting that particular classification study had a personality conflict with the Plaintiff (Docket Entry 25 ¶ 23);[21] (3) Due to limited funding and the fact Plaintiff did not require additional training concerning his jobs skills, the Defendant was unable to send Plaintiff to additional conferences (Docket Entry 31 ¶¶ 7, 8); (4) Plaintiff received a title increase in August 1999 and a raise in March 2002 and the unsolicited reclassification prepared by Plaintiff in October 2004 for his own position overstated and/or misrepresented Plaintiff's duties (Docket Entry 25 ¶ 18); and (5) Plaintiff, from the beginning of his employment, was encouraged to be more productive with his time and required close monitoring because, unlike others Pogue

---

[20]The Court notes that the general tenor of the memorandum is positive. Specifically, it concludes, "I'm delighted you've had the opportunity to do this as I know how much you enjoy photography. If the opportunity arises again or if other outside employment or extra assignments become available, please follow University policy as outlined in Outside Employment and Extra Compensation." (Docket Entry 24, Exhibit, Bates Number 000136).

[21]Plaintiff concedes that his was never terminated, demoted, received a salary reduction or had working hours reassigned. (Docket Entry 24, Exhibit, Bates Number 000032).

supervised, Plaintiff did not perform tasks with "built-in deadlines" (Docket Entry 25 ¶ 7).[22]

These documented reasons satisfy Defendant's burden to produce nondiscriminatory reasons for the employment decision.  Once the employer makes such a showing, the burden shifts back to the Plaintiff to show that the employer's reasons are pretextual.  To survive summary judgement, Plaintiff is required to show that the proffered reasons (1) have no basis in fact; (2) did not actually motivate the defendant's conduct; or (3) were insufficient to warrant the employment decision.  *Mitchell v. Vanderbilt Univ.*, 389 F.3d at 184(citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  In the instant case, Plaintiff has failed to even address Defendant's reasons let alone produce any evidence from which a jury reasonably could find that the employer's reasons were pretextual.  Therefore, summary judgment for Defendant on Plaintiff's allegation of race discrimination is proper.

### b.  Hostile Work Environment

Under Title VII, a "workplace [which] is permeated with 'discriminatory intimidation, ridicule, and insult,' and that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" violates the Act.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  To establish a *prima facie* claim of a hostile work environment under Title VII, the Plaintiff must prove the following elements: "(1) that he is a

---

[22]The Court notes that Pogue consistently noted in the majority of Plaintiff's evaluations that Plaintiff needed to be more productive.  Further, Plaintiff concedes in his deposition that Pogue felt everyone in the office needed to be more productive with their time.  (Docket Entry 24, Exhibit, Bates Number 000034). Additionally, in his deposition, Plaintiff was asked, "Did Ms. Pogue complain about the timeliness of your work?"  Plaintiff responded: "There was, all pretty much throughout the years I've been there, a consistent push to reduce the amount of time that it took to do classification studies. . . from day one, [19]88. . ."  (Docket Entry 24, Exhibit, Bates Number 000036)

member of a protected class: (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability." *Newman v. Fed. Express Corp.* 266 F.3d 401, 405 (6th Cir. 2001); 42 U.S.C. § 2000e *et seq.* In order to establish a racially hostile work environment under Title VII, the plaintiff must show that the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive *and* the victim subjectively regarded it as abusive. *Harris v. Forklift Sys., Inc.*, 510 at 21. The Sixth Circuit requires the district court to examine the totality of the circumstances surrounding the racially offensive conduct to determine if the offensive conduct is objectively and subjectively offensive. *Newman v. Fed. Express Corp.* 266 F.3d at 405. Specifically, courts should consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 at 23).

Plaintiff has failed to specifically cite any instances or behavior which he alleges created a hostile work environment. In fact, Plaintiff has failed to even respond to Defendant's arguments on this matter.[23] Therefore, it is difficult for the Court to determine why and what events the Plaintiff is claiming made his work environment hostile. However, in an abundance

_____

[23]Overall, the Court finds that Plaintiff's memorandum in opposition to summary judgment inadequate. While Plaintiff at least attempted to address Defendant's arguments regarding race discrimination, Plaintiff entirely ignores and fails to respond in anyway to Defendant's arguments regarding Plaintiff's hostile work environment and retaliation claims.

of caution, the Court has reviewed the record and has found it lacking of any evidence, other than Plaintiff's unsubstantiated opinion that his work environment was hostile.  This is insufficient to defeat the motion for summary judgment without "any significant probative evidence tending to support the complaint."  *Anderson v. Liberty Lobby*, 477 U.S. at 249.  Plaintiff has simply failed to provide and/or cite any evidence, other than his own beliefs and opinions, which establishes a *prima facie* case of hostile work environment.

### c.  Retaliation

Title VII provides in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees. . .because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  As with other Title VII claims, in the absence of direct evidence of retaliation, retaliation claims are governed by the *McDonnell Douglas* burden shifting framework.  *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002).

To establish a *prima facie* case for retaliation, Plaintiff must demonstrate four elements: (1) plaintiff engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or persuasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000).

To prove retaliation, a plaintiff must show that a *reasonable* employee would have found

20

the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006)(emphasis added). This is an objective standard which allows the Court to review the significance of any given act of retaliation upon viewing the particular circumstances and context on a case by case basis. *Id*. at 2416.

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances or simple lack of good manners that often take place at work and that all employees experience. *Id*. at 2415 (citing 1 B. Lindemann & P Grossman, Employment Discrimination Law 669 (3d ed. 1996)). Title VII does not set forth a "general civility code for the American workplace." *Id*. (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Rather, the anti-retaliation provision is meant to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC. *Id*. (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)).

As with his claim of hostile work environment, Plaintiff has failed to even respond to Defendant's arguments on this matter. Therefore, it is difficult for the Court to determine what events the Plaintiff is alleging are retaliation. Plaintiff has offered no direct evidence of retaliation and therefore, the Court reviews the record for evidence of retaliation. Further, the Complaint states that shortly after Plaintiff filed his EEOC complaint, "Defendant's treatment of Plaintiff became worse still, including but not limited to requiring Plaintiff, as a condition of employment, to maintain a level of detail in time accountability record keeping not required of

21

any non-protected employee."  (Docket Entry 1 ¶ 9).  Therefore, the Court will address this as Plaintiff's basis for retaliation.

As with Plaintiff's claim for racial discrimination, the Court finds that Plaintiff has failed to establish a *prima facie* case of retaliation.  As stated previously, Plaintiff is required to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). Testimony consisting of nothing more than rumors, conclusory allegations and subjective beliefs is wholly insufficient evidence to establish a claim of discrimination as a matter of law.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  The Plaintiff's unsubstantiated opinion, alone, will be insufficient to defeat the motion for summary judgment without "any significant probative evidence tending to support the complaint."  *Anderson v. Liberty Lobby*, 477 U.S. at 249.  Plaintiff has failed to set forth any evidence beyond the allegations of his pleadings and/or his deposition that any adverse employment actions took place or that he was being harassed by a supervisor as a result of filing his EEOC claim.  As noted previously, Plaintiff does not produce any evidence as exhibits to support his claim of retaliation nor is there any evidence of retaliation by way of excessive time recording requirements presented to the Court beyond Plaintiff's deposition.  Further, Plaintiff does not cite to any evidence in the record which he claims demonstrates retaliation.  Therefore, Plaintiff's retaliation claim must fail.

Even if Plaintiff had produced evidence establishing a *prima facie* case of retaliation, the Court notes that Plaintiff's retaliation still could not succeed.  Defendant presented evidence under the second stage of the *McDonnell Douglas* framework articulating a legitimate, nondiscriminatory reason for all actions taken regarding time record keeping.  According to

Defendant, and conceded by the Plaintiff, from the beginning of his employment, Plaintiff was encouraged to be more productive with his time and required close monitoring because, unlike others Pogue supervised, Plaintiff did not perform tasks with "built-in deadlines" (Docket Entry 25 ¶ 7). Further, the Plaintiff himself realized the need to complete his classification studies in a more timely manner as he made this one of his goals in 2003. (Docket Entry 24, Exhibit, Bates Number 000100).[24] Therefore, Defendant asserts this was the reason for requiring Plaintiff to keep time records.

This documented reason satisfies Defendant's burden to produce nondiscriminatory reasons for the employment decision. Once the employer makes such a showing, the burden shifts back to the Plaintiff to show that the employer's reasons are pretextual. Again, in the instant case, Plaintiff has failed to even address Defendant's reason let alone produce any evidence from which a jury reasonably could find that the employer's reason was pretextual. Therefore, summary judgment for Defendant on Plaintiff's allegation of retaliation is proper.

## CONCLUSION

Because Plaintiff has set forth no direct or circumstantial evidence to support any of his allegations and/or that any of Defendant's legitimate, non-discriminatory reasons were pretextual, by separate order, the Court will GRANT Defendant's motion for summary judgment (Docket Entry 21), dismissing the action.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge

---

[24]Plaintiff wrote, "I plan to reduce the average time it takes to complete a classification study by 5%. . ." (Docket Entry 24, Exhibit, Bates Number 000100).